IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 13-cr-00307-RM

UNITED STATES OF AMERICA,

       Plaintiff,

v.

KEVIN ADAM POMPA,

       Defendant.

───────────────────────────────────────────────

**DEFENDANT'S MOTION FOR A DOWNWARD SENTENCING VARIANCE PURSUANT TO 18 U.S.C. § 3553**

───────────────────────────────────────────────

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Defendant, Kevin Pompa, by and through his attorney of record, Matthew K. Belcher, and hereby requests that this Court vary below the advisory Guidelines and impose a sentence of **37 months**, followed by three years supervised release. In support thereof, Mr. Pompa would show as follows:

**I.**     **Section 2K2.1 does not reflect the Commission's exercise of its characteristic institutional role and is, therefore, entitled little, if any, deference**

While the advisory guidelines still remain an important consideration, it is "not the only consideration" in determining a reasonable sentence.[1] To the contrary, the guidelines "reflect a rough approximation of sentences that *might* achieve § 3553(a)'s objectives."[2]

---

[1] *Gall v. United States*, 552 U.S. 38, 49 (2007).

[2] *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)) (emphasis added).

A sentencing court "may not presume that the guidelines range is reasonable."[3] Rather, the sentencing court must make an "individualized assessment based on the facts presented."[4] Above all else, a sentencing court's final determination of a sentence must reflect § 3553(a)'s overarching instruction to impose a sentence sufficient, but not greater than necessary, to accomplish the sentencing goals advanced in § 3553(a)(2), namely, retribution, deterrence, incapacitation, and rehabilitation.[5]

Importantly, when making these individualized assessments, sentencing courts are free to disagree with the guidelines' recommended sentence in any particular case, and may impose a different sentence based upon a contrary view of what is appropriate under § 3553(a). This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the guidelines.[6]

### A. The flawed development of the firearms guideline render the advisory range a poor guide to the minimally sufficient sentence. A below-range sentence is thus merited.

The firearms guideline is problematic in Mr. Pompa's case because the guideline does not reflect an exercise of the Commission's unique role and expertise. The range applicable to the conduct underlying Mr. Pompa's offense has increased dramatically, to the point where it is unrecognizable in relation to the ranges that applied at the beginning

---

[3] *Gall*, 552 U.S. at 50 (citing *Rita*, 551 U.S. at 351).

[4] *Id*.

[5] *See Kimbrough*, 552 U.S. at 111.

[6] *See Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011) (holding that, post-*Booker*, a sentencing court may in appropriate case impose a non-Guidelines sentence based on a disagreement with the Commission's views); *Spears v. United States*, 129 S. Ct. 840, 843 (2009) (confirming *Kimbrough's* holding that courts may vary from particular Guidelines based on policy disagreements).

of the guidelines era.  More significantly, the reasoning underlying these changes is seriously flawed, rendering the advisory range a poor guide to the minimally sufficient sentence.  In *Rita*, the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives."  First, the original Commission used an "empirical approach" which began with "an empirical examination of 10,000 presentence reports" setting forth what judges had done in the past.  Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other front line actors, civil liberties groups, and experts.[7]  Where revision, however, is not based on judicial feedback or other empirical research, the rationale for viewing the ranges as a rough approximation of sentences that might achieve the statutory sentencing objectives is absent.  That is the case with respect to the firearms guideline as it applies to Mr. Pompa, which renders the range a poor guide to the minimally sufficient sentence.

> **1.    The range applicable to Mr. Pompa's offense conduct and criminal history category has increased from 8 to 14 months at the outset of the guidelines era to 57 to 71 months today.**

The original version of § 2K2.1 set a base offense level of 9.[8]  No specific offense characteristics enhancement would have applied because the firearm possessed by Mr. Pompa was neither stolen nor did it have an obliterated or altered serial number.  With acceptance of responsibility, Mr. Pompa's range would have been 8 to 14 months.  In 1989, however, the initial version was amended and the base offense level was increased

---

[7] *Rita*, 551 U.S. at 348-350.

[8] *See* U.S.S.G. § 2K2.1 (1987 ed.).

from 9 to 12.[9]  Under this amended version, after the two-level reduction for acceptance, Mr. Pompa's range would still have only been 15 to 21 months.

In 1991, the firearms guideline was drastically amended in a number of ways. Relevant to Mr. Pompa, his base offense level was increased from 12 to 24, applicable when the defendant had at least two prior convictions of either a crime of violence or a controlled substance offense.[10]  With these new amendments, Mr. Pompa's guideline range skyrocketed from 15 to 21 months to a recommendation of 63 to 78 months.  A year later, the Commission promulgated the provision permitting a third point of acceptance of responsibility; with that adjustment, Mr. Pompa's range in 1992 would have been 57 to 71 months; roughly **four times** as much as he was facing just a few years earlier.[11]

### 2. The dramatic increase to the offense level in 1991 did not reflect an exercise of the Commission's characteristic institutional role.

The most dramatic increase to the firearms guideline, as applicable to Mr. Pompa, occurred in 1991, following a detailed examination of the guideline by the Sentencing Commission's Firearms and Explosive Materials Working Group ("Working Group"). Unfortunately, the guideline was revised in a manner (as applicable to Mr. Pompa's case) that did not reflect the Working Group's findings.  In fact, the guideline was revised in a manner that directly contradicted some of the Working Group's explicit findings.

Prior to the 1991 amendments, the Commission directed the Working Group to

---

[9] See U.S.S.G. § 2K2.1(a)(2) (1989 ed.).

[10] See U.S.S.G. § 2K2.1 (1991 ed.).

[11] See U.S.S.G. § 3E1.1 (1992 ed.).

4

thoroughly examine the firearms and explosives guidelines and to make appropriate revisions. In December, 1990, the Working Group issued its report.[12] After reviewing sentencing data, case files, reported decisions, and feedback from the field and from the Bureau of Alcohol, Tobacco, and Firearms (ATF), the Working Group recommended the consolidation of several firearms guidelines into one, § 2K2.1. One of the reasons specifically stated for this consolidation was to reduce the number of departures and consequent disparity by relying more heavily on specific offense characteristics.[13]

Given this emphasis on "specific offense characteristics," the Working Group sought to discern which offense characteristics correlated with the sentence length, presumably with the goal of revising the guidelines accordingly.[14] The review determined that the offense characteristics impacting sentence length included "actual or intended unlawful or criminal use of the firearm, possession of the firearm for personal protection, sporting or collection purposes, drug-related conduct, N.F.A. firearms, and destructive devices."[15] Significantly, the existence of prior convictions was not among this list. In fact, the Working Group explicitly concluded that sentence length "does not seem strongly correlated with the existence of prior firearms or drug-related offenses or convictions for crimes of violence."[16] It thus made no sense to raise the base offense levels based on such

---

[12] U.S. Sentencing Commission, Firearms and Explosive Materials Working Group Report (Dec. 11, 1990).

[13] *Id*. at pp. 10-11.

[14] *Id*. at pp. 18-19.

[15] *Id*.

[16] *Id*. at p. 140.

convictions, but that is what the Commission did nonetheless.

From this point, based on what it considered to be a high rate of sentences at the upper end and above the range in firearms cases, the Working Group concluded that some increase in the ranges was warranted. While this might have been a rational decision as a general matter, the route chosen by the Working Group and, ultimately, the Commission, was not rational, at least as applied to cases like Mr. Pompa. In direct contravention of the Working Group's conclusion that sentence length was not strongly correlated with the existence of qualifying priors, the amendment turned this finding on its head and the existence of qualifying priors became the main driving factor in a significantly higher base offense level. Specifically, the guideline was amended to provide that a defendant with two prior qualifying convictions was subject to a base offense level of 24. That resulted in a guideline range that was twelve-levels higher than the base offense level provided for in the 1989 and 1990 versions, and more than twice the base offense level of nine provided for in the 1987 and 1988 versions.

Further undercutting the reliability of the amendment as a guide was the degree of the change wrought by the amendment. While the sentences resulting from the early versions of the guidelines were, the Working Group concluded, disproportionately imposed at the high end of, or above, the ranges, the Working Group pointed to no evidence that indicated the need to increase the ranges so drastically. Specifically, the Working Group's report noted that § 922 cases "not sentenced under the guidelines have received sentences ranging from 32 months to 62 months, with an approximate average annual total

6

of 42 months."[17]  The 1989 data file showed an average sentence of 43 months for firearms cases overall[18], an average of 14 months under § 2K2.1(a)(2) specifically, and a range of sentences under § 2K2.1(a)(2) from probation to 48 months.[19]  The Working Group further reported that defendants in criminal history categories V and VI "averaged thirty-eight month sentences, more than twice the average of all cases."[20]  Nothing about this data indicated that judges thought the average firearms sentence should jump as dramatically as they have, and certainly not based on a certain type of prior conviction.

To summarize, the Working Group specifically found that no strong correlation existed between the length of sentences imposed in firearms cases and the existence of certain types of prior convictions.  Additionally, the Working Group found that only modest increases in the guidelines were necessary to comport with the national average sentences being imposed under § 2K2.1.  The Commission, however, completely disregarded the findings and, instead, created a guideline driven primarily by certain types of prior convictions, convictions that are already accounted for in the criminal history category calculations.  This extreme "double counting" was not tailored to its own research and findings, which at the most indicated a need for modest increases, and, as such, warrants little, if any, deference by this Court when fashioning a sufficient, but not greater than necessary, sentence under § 3553(a).

---

[17] *Id*. at p. 16.

[18] *Id*. at p. 17.

[19] *Id*. at p. 134.

[20] *Id*. at p. 139.

## II. A sentence of 37 months imprisonment is sufficient, but not greater than necessary, to further the objectives set forth in 18 U.S.C. § 3553(a)

### A. Mr. Pompa's Prior Criminal History

Chapter Four of the advisory guidelines was created and designed to address the frequency, seriousness, and recency of a defendant's prior record. The Commission believed these items were reliable predictors of *future criminal conduct*.[21] Simply put, the Commission concluded the number of prior convictions, along with the length of the prior sentence, could reasonably predict the *risk of recidivism*. Accordingly, the higher the risk, the higher the recommended sentence. Notably, the type of prior convictions, or the length of those priors, were not determined to also be aggravating factors when determining the seriousness of the *instant offense*.

Mr. Pompa has two prior felony convictions, a Felony Menacing conviction and a Second Degree Assault by Drugging, both of which occurred six years ago in 2007. The Presentence Report correctly assesses three criminal history points for each prior conviction and an additional two points due to the fact that Mr. Pompa committed the instant offense while on parole. These prior convictions, and the fact that Mr. Pompa was on parole when he committed the instant offense, has resulted in Mr. Pompa falling within Criminal History Category IV. As such, the guidelines recommend an aggravated range of punishment to address Mr. Pompa's increased risk of recidivism based on the length and number of countable prior convictions.

---

[21] *See* U.S. Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 43 (1987).

Having been accounted for in determining Mr. Pompa's level of risk to re-offend, there is no compelling reason to also use these six year old convictions to justify a ten-level increase in the base offense level, which is purportedly calculated to reflect the severity of the instant offense - not past offenses.  Understandably, such factors as the criminal use or intended criminal use of the firearm, whether the firearm was stolen or had an obliterated serial number, or whether the firearm was used in connection with another felony offense are all aggravating factors in determining the severity of the *instant offense* – but none of those factors are present in Mr. Pompa's case.

During the first several years of the guidelines, the base offense level for an individual convicted of illegally possessing a firearm increased from nine to twelve to fourteen.  The increase in 1991 to a base offense level of fourteen was to reflect the fact that courts had, more often than not, imposed top end of the guidelines or slightly above the guideline sentences.  The need for this slight increase was supported by the Working Groups empirical data and research.  The additional base offense level increases based solely on the type of prior convictions were not, however, based on the Working Group research and data.  As such, the requested sentence of **37 months** was formulated by utilizing the base offense level of 14, subtracting two levels for acceptance of responsibility, and then treating Mr. Pompa as a Category VI offender (even though he is technically a Category IV offender) to address the legitimate concerns voiced by Probation concerning Mr. Pompa's commission of the Second Degree Assault while on probation and then committing the instant offense while on parole.

### B.   Nature & Circumstances of Mr. Pompa's Offense

Mr. Pompa pleaded guilty to one count of Felon in Possession of a Firearm. The firearm in question being found in his vehicle after his parole officer conducted a search pursuant to the terms of his parole with the State of Colorado. This search occurred after Mr. Pompa reported to his parole office, as requested, and was arrested for separate alleged parole violations. The firearm in question was neither stolen nor did it have an altered or obliterated serial number. Additionally, no evidence exists to suggest that Mr. Pompa possessed the firearm with intent of committing an additional criminal offense or in connection with another felony offense. In fact, as the Court will be informed during Mr. Pompa's allocution, the sole purpose for the possession of the firearm was personal protection.

### C.   Condign Sentence Furthering 18 U.S.C. § 3553(a)(2) Objectives

The ten-level enhancement in the base offense level for two seven year old prior felony convictions that have no bearing on the instant offense (and did not even involve firearms) is unreasonable, in direct contradiction with the empirical data and research conducted by the Commission itself, and results in unwarranted "double counting." Without such an enhancement, Mr. Pompa would be starting out with a base offense level of 14.

Specifically referencing Mr. Pompa's offense, there are no additional "specific offense characteristics" that would differentiate Mr. Pompa's felonious possession of a firearm from the run-of-the-mill felon-in-possession case. As the Working Group noted in their report to the Commission, when reviewing "past-practices," the Group noted that certain factors, such as stolen firearms, obliterated or altered serial numbers, or

possession of the firearms for criminal purposes, have been legitimate basis for increased sentences under 18 U.S.C. § 922(g)(1). Absent such aggravated factors, an increased sentence, especially one resulting in a ten-level increase solely based on prior convictions, would be unreasonable and unwarranted in this case.

A prison term of **37 months** would promote respect for the law, provide just punishment, afford adequate deterrence, and reflect the nature and circumstances of the instant offense and the personal history and characteristics of Mr. Pompa.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender, Interim


s/ Matthew K. Belcher
Matthew K. Belcher
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Matthew.Belcher@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on December 24, 2013, I electronically filed the foregoing **DEFENDANT'S MOTION FOR A DOWNWARD SENTENCING VARIANCE PURSUANT TO 18 U.S.C. § 3553** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Jeremy Sibert, Assistant U.S. Attorney
Email: jeremy.sibert@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Patrick Lynch, United States Probation Officer  *(via e-mail)*

Mr. Kevin Pompa
Federal Detention Center
(via mail)

                                                s/ Matthew K. Belcher
                                                Matthew K. Belcher
                                                Assistant Federal Public Defender
                                                633 17th Street, Suite 1000
                                                Denver, CO  80202
                                                Telephone:  (303) 294-7002
                                                FAX:  (303) 294-1192
                                                Matthew.Belcher@fd.org
                                                Attorney for Defendant