IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 13-cr-307-RM

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

KEVIN ADAM POMPA,

    Defendant.
_____

**REPORTER'S TRANSCRIPT**
SENTENCING HEARING
_____

    Proceedings before the HONORABLE RAYMOND P. MOORE,
Judge, United States District Court for the District of
Colorado, occurring at 4 p.m., on the 8th day of January, 2014,
in Courtroom A602, United States Courthouse, Denver, Colorado.

**APPEARANCES**

    JEREMY SIBERT, Assistant U.S. Attorney, 1225 17th
Street, Suite 700, Denver, Colorado, 80202, appearing for the
Government.

    MATTHEW BELCHER, Assistant Federal Public Defender,
633 17th Street, 10th Floor, Denver, Colorado, 80202, appearing
for the Defendant.

TAMMY HOFFSCHILDT, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

**P R O C E E D I N G S**

(In open court at 4:01 p.m.)

*THE COURT:*  Please be seated.  All right.  We're here today on 13-cr-307, United States of America versus Kevin Adam Pompa, and I pause only because I have some vague memory of me mispronouncing his name.

*MR. BELCHER:*  I mispronounce it, as well, Your Honor. I will defer to him.

*THE DEFENDANT:*  Pompa.

*THE COURT:*  At least I remembered that.  I will take appearances.

*MR. SIBERT:*  Good afternoon, Your Honor.  Jeremy Sibert on behalf of the United States.

*THE COURT:*  Good afternoon.

*MR. BELCHER:*  Good afternoon, Your Honor, Matthew Belcher on behalf of Mr. Pompa, seated with me, at counsel table, is Laura Suelau.

*THE COURT:*  Who is?

*MR. BELCHER:*  A volunteer in our office.

*THE COURT:*  All right.  Good afternoon to each of you. Before court, Mr. Belcher stopped by and introduced his, let's say, assistant to me, and I said that I didn't mind if she sat at counsel table here today, and I also told him that was a standing offer.  I extend the same offer to the U.S. Attorney's Office.  If there are people, whether they be interns, externs,

1    may wish to sit at counsel table, you don't need any special

2    permission from me, with respect to that.

3         MR. SIBERT:  Thank you, Your Honor.

4         THE COURT:  All right.  So we're here today for

5    sentencing in this case following Mr. Pompa's earlier plea of

6    guilty to Felon In Possession Of A Firearm.  Before proceeding

7    to sentencing, at this time I formally accept the Plea

8    Agreement, pursuant to which the plea of guilty was previously

9    made.

10         Mr. Belcher, has Mr. Pompa -- have you and Mr. Pompa

11    received a copy of the Presentence Investigation Report

12    prepared in this matter, including any addenda, and the

13    probation department's recommendation?

14         MR. BELCHER:  We have, Your Honor.

15         THE COURT:  All right.  And is the same true of the

16    Government, Mr. Sibert?

17         MR. SIBERT:  Yes, Your Honor.

18         THE COURT:  All right.  If I am correct, I was looking

19    to see what had been filed, and what I see filed is **ECF Number

20    25** Motion For A Non-Guideline Sentence And Variance, filed on

21    behalf of Mr. Pompa, by Mr. Belcher, which I believe also

22    contained an objection to --

23         MR. BELCHER:  They were separate documents,

24    Your Honor.

25         THE COURT:  They were separate documents.  The other

1    was -- I see what it is.  The objection and response was **ECF**

2    **Number 22**, which was an objection to a supervised-release

3    condition, in that those two are the only matters that I'm

4    aware of that have been filed on behalf of the Defendant.  Am I

5    correct?

6            *MR. BELCHER:*  That is correct, Your Honor.

7            *THE COURT:*  I also reviewed and received a response to

8    the request for a downward sentence by the Government, in which

9    it voiced its disagreement with both the desired sentence, as

10   well as the rationale filed for it, filed by Mr. Sibert.

11           I have not received, I don't believe, or seen filed, a

12   motion authorizing the third acceptance point, and I would

13   accept an oral motion, in that regard, from the Government.

14           *MR. SIBERT:*  Yes, Your Honor.  At this time we would

15   move for third level, pursuant to this Defendant's plea of

16   guilty and the Court's acceptance of that plea.

17           *THE COURT:*  And I grant that oral motion and would

18   therefore find Mr. Pompa, at least under the advisory

19   guidelines, authorized to receive the full three points for

20   acceptance of responsibility.

21           Let's begin with -- well, I suppose it's fair to say

22   that there are no objections that were filed by the Government?

23           *MR. SIBERT:*  That's correct, Your Honor.

24           *THE COURT:*  And so I think it's fair to say that at

25   least as to the factual matters contained in the presentence

1   report, there are no objections, and I will adopt those as my

2   factual findings.

3        Let's turn to the issue of the objection that

4   Mr. Belcher makes, with regard to the search condition, and for

5   the record, the probation department is -- has requested that I

6   impose a condition authorizing it to conduct a reasonable

7   search of Mr. Pompa's residence or whereabouts ... actually

8   search of his person, property, house, residence, papers or

9   office, if there are -- if there is reasonable grounds to

10  believe that such a search may produce evidence of a violation,

11  and you have objected to it.

12       MR. BELCHER:  We have, Your Honor, on a couple of

13  grounds.  One of them might not be ripe, at this point in time.

14  The one that most likely -- or is, is we are saying that this

15  is greater than necessary, a greater depravation of liberty

16  than necessary to accomplish the goals that supervised release

17  and its conditions are supposed to be set forth.

18       Additionally, we believe that such a search condition

19  is unconstitutional, that's probably not something that is ripe

20  at this point.  It would only be if my client, unfortunately,

21  happened to be in a circumstance while on supervision, this

22  occurs, criminal conduct is found, charges are found, and then

23  there's an issue of whether or not that was a legal search.

24       THE COURT:  It's always tricky as to when is the right

25  time to raise those issues with respect to supervised release,

1    because if you don't raise them now, it may be the case that on

2    the back end the Court, myself, or a different or higher Court

3    would say, *Well, you didn't object to the condition, don't*

4    *start complaining about it now*.  So I don't know whether it's

5    ripe or not ripe.  I intend to consider it without regard to

6    its ripeness.

7         MR. BELCHER:  Primarily, Your Honor, the reason I

8    bring that up is, as the Court has seen in my objection, the

9    main issue I have that differentiates this from parole and

10   probation situations, is that the Supreme Court, when finding

11   that such conditions were reasonable, when an individual was on

12   probation or parole, I believe the lynchpin of their ruling was

13   the fact that the individual consented to that condition in

14   exchange for probation and/or parole, and they found that that

15   consent greatly diminished their expectation of privacy, under

16   the Fourth Amendment, and I think that's a large distinction

17   from what we have here with conditions that aren't a condition

18   precedent for getting out of prison early, or for getting out

19   of going to prison at all.  It's not a give-and-take-type

20   situation.  It's, *You do this no matter what*.

21        THE COURT:  I understand that, and certainly, I also

22   understand that you are not consenting to it, or rather,

23   Mr. Pompa is not consenting to it.

24        MR. BELCHER:  Which would be more towards the future,

25   if the Court were to impose such a condition.  I just wanted to

1 make it clear for whoever --

2   THE COURT:  So how do you deal with *Hanrahan*, the

3 Tenth Circuit case that approved the condition just like this?

4 Actually, the way I read the case -- and just for the record,

5 if I have mispronounced it, 508 Fed. 3rd, 962.  As I read the

6 case it's actually the search condition that was approved there

7 is arguably more harsh than the search condition that's

8 requested here, because it's not -- again I'm going from

9 memory -- but it wasn't confined to searches, to find evidence

10 of a violation of supervised release.  It was simply something

11 that was interpreted by the Circuit as being; one, lawful, and

12 presumably therefore constitutional; and, two, something that

13 was of value, in that it would provide deterrence and

14 protection in a felon-with-a-gun case.

15   MR. BELCHER:  What I will say, in response to that,

16 Your Honor, I would say two fold, one, the obvious being that

17 that is why I have pointed out to the Court that the

18 constitutionality of that is probably not either ripe or even

19 up to this Court, maybe in light of the Tenth Circuit, I don't

20 think there was a ruling on constitutionality there; but two,

21 why I have primarily put in there that we believe it's a

22 greater depravation of liberty for my client, in this case,

23 when determining whether or not to impose certain conditions;

24 such as, any other condition.  It's not just imposing

25 conditions, and I know the Court is aware of that, but it's a

1    fact-sensitive case looking at my client, in particular, and I

2    don't believe his history or the facts of this case warrant

3    such a depravation as a probation officer going into his house.

4    I mean, reasonable suspicion of a violation, that could be --

5    reasonable suspicion that he, you know, didn't go to work that

6    morning or reasonable -- you know, the violations could be as

7    small, minute and technical, and yet they are jumping into

8    where even that small of a violation can allow someone to go

9    rolling into someone's house.

10        THE COURT:  And I certainly agree with you now that we

11   are drifting down into the hypothetical in the future, because

12   obviously if you were talking about he didn't go to work that

13   day, I don't know what they would be searching for to establish

14   that, and if there was some impropriety with the search, I

15   would expect you to be raising some issue, with regard to that.

16   But, be that as it may, I understand your position.  I will

17   hear from the Government, although I will forecast, Mr. Sibert,

18   that you may be brief.

19        MR. SIBERT:  Yes, sir.  Your Honor, the Government

20   does agree with the interpretation that the Court laid out with

21   the Tenth Circuit case.  I think when it comes to a case like

22   this; one, the probation officer still needs to meet a

23   condition.  Still needs to meet a standard.  There still needs

24   to be that reasonable suspicion.  And I think it does provide

25   deterrence.  I think it does provide society a little greater

1  protection after someone gets out of imprisonment, during his

2  time of supervised release.

3          Saying that, you know, it takes reasonable suspicion,

4  right now, for a *Terry* stop, and that's when someone hasn't

5  even committed a crime.  Now we have someone that has been

6  convicted, the standard -- the watchful eye of the Court is on

7  the Defendant for a certain amount of time that the Court

8  orders, and there's still a standard that the probation officer

9  has to prove, and I think the Court raised the right point.  I

10  mean, why would they do a search, if he didn't show up for

11  work?  That doesn't justify a search for a firearm.

12          However, if someone came to probation and said, we

13  think, you know, we have been offered a firearm from the

14  defendant, now I think we are starting to build a reasonable

15  suspicion.  So I think it does provide deterrence, but the

16  standard still needs to be met, so we would ask for that

17  condition.

18          *THE COURT:*  And you know, again, it was my comment

19  that led to the discussion about why would they do this, why

20  would they do that?  With no disrespect to the probation

21  department, I recognize, Mr. Belcher, that people do strange

22  things, may be an individual officer that does something

23  strange.  I will not speak as to any of my colleagues, but I

24  guarantee you that I, myself, as a Judge will be or have been

25  both accused of doing something strange.  People do strange

1    things, and I recognize that, but that seems to me more of an

2    argument that's better made in the confines, within the

3    parameters of particular facts, what we can look at and make

4    judgments on as to whether or not the search was pursuant to

5    the conditions.

6            So what I will tell you is that I -- I'm going to

7    overrule the objection, both on statutory grounds, in terms of

8    greater depravation of liberty than necessary, as well as on

9    constitutional grounds.  He is subject to a home search.

10   There's no claim that that -- to home -- I'm sorry -- to home

11   visits at any time, and required to permit them entry.  To some

12   extent, that alone suggests that the privacy interest is, at

13   least, different from an ordinary citizen without a record, but

14   at the end of the day, I think we have an individual with a

15   gun, on parole, bringing it to a parole meeting.  There are --

16   there is at least a history of disrespect for Court orders with

17   respect to, I believe it was, the first of his convictions,

18   that was converted later into a jail -- an incarcerative

19   sentence, based on failures to comply with probation and/or the

20   terms of the deferred.  And I can look that up to be more

21   precise.  It was both.  It was the probation and a deferred,

22   with respect to the Adams County matter in 06CR1453.  I

23   recognize that he doesn't consent.  I note that for the record

24   that he does not consent, but I do not think that there is

25   anything inappropriate with this, particularly in light of the

1    Tenth Circuit's opinion that I previously referenced, and so,

2    for that reason, I will overrule the objection.

3            Now, as to sentencing, I will hear from -- my usual

4    practice is to hear from the Government and then hear from the

5    Defendant, but, Mr. Belcher, in this instance, you're pitching

6    a variance and so perhaps it's more rational to have -- to let

7    you take the floor, so to speak, and pitch away, and then we

8    will let Mr. Sibert respond to that, and then the last word --

9    well, and then we will go ahead and deal with anything else

10   that people want to say by way of sentencing.  But let's deal

11   with the Motion For Variance.

12           *MR. BELCHER:*  Okay.  And before I forget, Your Honor,

13   because I tend to do so, I didn't know this Court's policy,

14   because I have not encountered it before.  My client's wife,

15   asked, before court, if she would be allowed to say something

16   on his behalf.  I didn't know the Court's policy.  I know some

17   Judges allow it here, some Judges don't.  If not, she also has

18   a letter I can read to the Court or present to the Court.

19           *THE COURT:*  My inclination is not to do that, however,

20   since my inclination was not known, I will excuse -- I will

21   make an exception in this instance and let her make a brief

22   statement.

23           *MR. BELCHER:*  Okay.  I appreciate it, Your Honor.  As

24   for the variance, Your Honor, without going into too depth of

25   regurgitating what's already been presented to the Court --

1    *THE COURT:*  And I think each side has written a fairly

2    comprehensive view of their positions, so I don't feel that I

3    don't understand where each side is coming from.

4        *MR. BELCHER:*  And what I have decided, Your Honor,

5    instead of boring everyone with going back through every little

6    detail, the history and the reasons behind it, is after reading

7    the Government's response, I kind of want to address my

8    position, through the Government's response, in this sense.

9        In response to my, I guess, what would be considered a

10   rather lengthy variance motion, the Government, in my opinion,

11   has advanced a line of reasoning or an argument that's failed

12   in respects to a different guideline in front of the Supreme

13   Court.  Essentially, in the Government's response, they've

14   pointed out that the enhancements brought about by the 1991

15   changes to 2K2.1, obviously the ones in question being the

16   base-offense level increases for prior convictions came about

17   and are reasonable for two separate somewhat commingled

18   reasons; one being, that it is expressing Congress' will that

19   individuals with prior convictions are more dangerous; and two,

20   that of -- you know, for lack of a better term, it looks bad

21   that the guideline ranges are this low for everyone and then an

22   armed career criminal gets 15 years.

23       *THE COURT:*  I think you may be putting a little more

24   spin on Mr. Sibert's position than is justified by saying it

25   just looks bad.

1          *MR. BELCHER:*  No.  I'm saying that's the argument,

2    proportionality; that's what they are saying.  It looks bad to

3    have somebody with two priors get 21 to 31 months, and a guy

4    falling under this Armed Career Criminal getting 15.  I mean,

5    that's in the working-group deal that I cited to the Court,

6    it's in their response and it's the identical argument fronted

7    by the Government in *Kimbrough*.

8          And just a brief history with that.  I know everyone

9    is aware of *Kimbrough*, but the issue being the 101 crack

10   cocaine disparity in the guidelines.  How did that come about?

11   In 1986 Congress passed a law that changed zero to 20, to a

12   step ladder of zero to 25 to 40, ten to life.  In those

13   different mandatory-minimum ranges, they set out a

14   weight-driven formula on what type of weight of drugs triggers

15   the five- and ten-year mandatory minimums.

16         As everyone knows, a smaller amount of crack triggered

17   the mandatory minimums, than cocaine.  So that if you had X

18   amount of crack, you could get the five mandatory minimum, but

19   you would have to have a lot more cocaine, powder, to get the

20   five year.  So, it went in front of the Supreme Court, and this

21   was being challenged, saying it's unfair, it's not part of the

22   empirical research data past practices, the Government said two

23   things; one, this is reflecting the will of Congress.  They

24   obviously think crack is worse than powder, because they have

25   let it trigger the mandatory minimums, and we are just

1    adjusting it because they think it's worse; and two, these

2    mandatory minimums in place now, our guidelines, are lower,

3    they are not proportional, so we have to make them higher to

4    reflect these mandatory minimums, and both of those arguments

5    were rejected by the the Supreme Court.

6         THE COURT:  I'm not sure that your pitch isn't low and

7    outside, Mr. Belcher, at least in this respect.  The way that I

8    key *Kimbrough* was that the big complaint, with respect to the

9    crack guideline was that the Commission stood and said we were

10   required to tether -- basically, to build the guidelines

11   backwards from the mandatory minimums and the statutory

12   maximum, and basically tether the guidelines to these

13   positions, and the Court said rightfully, *No.  That's a choice*

14   *you made, but you are not required to do so.*

15        I don't know that the Commission has -- or that

16   Mr. Sibert is saying anything much different than to call this

17   kind of an un-expert or an irrational guideline isn't

18   necessarily the right outcome, when there seems to be a steady

19   progression from one with one felony to one with two felonies

20   to one with three felonies, and that that is hardly an

21   irrational approach.  No one is suggesting that the guideline

22   is -- it reads as it does, because the Commission was required

23   to work backwards from the ACC guideline.

24        MR. BELCHER:  That's exactly what the -- their

25   recommendation says.  It's all driven by the Armed Career

1    Criminal Act.  Nothing was being changed that drastically,

2    especially based on prior convictions, because they were

3    looking at what was going on in the courts, and seeing all of

4    these Judges enhancing sentences and imposing above-guideline

5    sentences, based on certain prior convictions.

6         THE COURT:  Well, but I mean, I don't think that it is

7    necessarily irrational to have a progression of guideline

8    consequences depending upon felonies, if, in fact, that is

9    something that you are looking at as an offense characteristic,

10   and I am not sure that it's quite the same as saying in the

11   drug context, the guideline sits where it sits, specifically

12   because it's tethered to the mandatory minimum.  I mean this is

13   not tethered to 15 years; not even close.

14        MR. BELCHER:  The drug guidelines weren't tethered to

15   the mandatory minimums either, but they said they did.

16        THE COURT:  They were by the Commission.

17        MR. BELCHER:  No, they weren't.

18        THE COURT:  Set it so that a Category I offender would

19   come in just under -- well, so that the mandatory minimum would

20   fall at --

21        MR. BELCHER:  Or near about.

22        THE COURT:  -- or thereabouts, and essentially that's

23   tethering to me.

24        MR. BELCHER:  Right.  And I am failing to see the

25   distinction with absent a 15 to life mandatory minimum Armed

1    Career Criminal Act, these guidelines wouldn't have been

2    changed, based on that.  The Commission's report, itself,

3    looking at the empirical data and past practices of the

4    sentencing courts, found no correlation between the sentences

5    and certain priors.

6            And going to the rationality or irrationality of it, a

7    couple of points; one, that's not what the Supreme Court is

8    looking at through *Kimbrough*, *Gall*, *Rita* and all of that, when

9    determining whether or not a Court can have a policy

10   disagreement.  What they're looking at, as they said it in

11   *Kimbrough*, is you can -- you can put whatever you want -- you

12   can put the guidelines wherever you want, but just because you

13   put them there, doesn't necessarily mean that the empirical

14   data and past practices support that, and the Court can look at

15   that.

16           *THE COURT:*  Make no mistake, I'm not suggesting that I

17   am constrained by something -- by the -- I'm in any way

18   constrained by the fact that the ACC sentence is 15.

19           *MR. BELCHER:*  I understand that, Your Honor.  What

20   I'm -- what I'm trying to highlight to the Court, maybe I'm

21   just spinning my wheels, is that I see no difference in

22   changing drug guidelines, not because Courts, when they looked

23   at what was going on sentencing wise, were increasing crack

24   sentences versus powder, but simply because of congressional

25   action, for proportionality purposes, any different, than

1   going, *Oh, we have got to change these gun guidelines, not*

2   *because all the Courts are doing this, but because we have to*

3   *make it look proportional to this 15 year to life.*

4        THE COURT:  Okay.  And here is my point on this, to

5   make it simple, as you and I have gone around the maypole a few

6   times in a different context, you know that my first impulse is

7   not to say, *Well that guideline is not based on anything*

8   *empirical, so I'm just going to completely disregard it,*

9   because it's one thing to say that there is not a factual,

10  scientific difference between crack cocaine and powder cocaine

11  and quite another thing to say, *Well, how shall we assess*

12  *points to judge the severity of a felon with a gun offense*?

13  And if, in fact, you want to collapse the roof down, and go

14  back to the old one, specific-offense characteristic for

15  everyone, I would say that I would have a problem with that,

16  and the reason I would have a problem with that is I would say,

17  if you lined up for me persons with -- that I was trying to

18  deter from possessing guns, perhaps someone with a -- with a

19  murder conviction, might be someone that I would be more

20  concerned about than someone with a forgery conviction.

21        MR. BELCHER:  Very much --

22        THE COURT:  And now we are starting to get into this

23  realm of, *Do I want persons to be more deterred based on the*

24  *nature of their convictions,* and here we've got two crimes of

25  violence.

1              So --

2          MR. BELCHER:  We do have two crimes of violence,

3    Your Honor, but there's two separate points to be made there;

4    one, my argument is not we should collapse is down to one

5    single, specific offense.  It's quite the contrary, and I think

6    the Court is highlighting my position.  It shouldn't be based

7    on these random decisions on what qualifies as a crime of

8    violence, what doesn't, what type it is, because then you get

9    into a situation.  I have a client with two possession charges.

10   He is not getting an enhancement to 20, because it's not a drug

11   trafficking, but if he pleads down to possession, even though

12   he had two kilos --

13         THE COURT:  That's not him.  That's not him.

14         MR. BELCHER:  I understand, but I'm trying to -- my

15   point to the Court is, I agree, we shouldn't get into that

16   theoretical game of, *Oh, what priors* and what everything else,

17   but that's how the guidelines are structured.

18             What I have put in my --

19         THE COURT:  You hit a woman in the face with a bottle,

20   I mean come on.

21         MR. BELCHER:  I understand that that is specific to

22   him.  I understand that that's something that should be

23   considered, and I have put that in my calculation for

24   sentencing, and that's exactly my point.  We should be looking

25   at my client, not trying to determine, *Oh, well one prior could*

1   *trigger this or one prior couldn't trigger this.*  I mean you

2   get situations like this.  The Plea Agreement is 41 to 51

3   agreement to recommend that.  The residual cause, Tenth Circuit

4   case, there's no objection that the second-degree assault,

5   while it doesn't qualify under the elements prong or the

6   enumerated prong, falls under the residual clause, and now it's

7   57 to 71, and we have a situation where he could have been --

8   you would have had a recommendation from the Government for 41

9   to 51 months, wherever it was.  Nothing changed with my

10  client's history.  Everyone knew what his history was, but

11  because the guidelines decides that this one gets another bump

12  to ten extra bumps, then all of a sudden this new guideline

13  range is all of a sudden the reasonable range and what --

14          THE COURT:  Except that Mr. Sibert didn't agree to

15  anything other than give him the full three points for

16  acceptance.

17          MR. BELCHER:  Well, typically it does.  I overlooked

18  that.

19          THE COURT:  I grant you that --

20          MR. BELCHER:  I overlooked that.  But needless to say,

21  Your Honor, what I'm trying to get the point -- the Court to,

22  and my point, as I put it in pages eight through twelve, so

23  this wasn't a theoretical attack solely, as was mentioned in

24  the Government's response, I actually tied it to my client, and

25  here is what I have tied to my client.  The specific offense.

1   I'm not saying you ignore your priors.  I'm not saying you turn

2   a blind eye to what's been done in the past.  I understand all

3   of that.  But you also look at a felon in possession.  As the

4   Court mentioned, you line up four or five people in front of

5   this Court, there's going to be varying degrees of the actual

6   crime, of what they actually did, and we don't have the

7   specific aggravators that we have in other cases.  We don't

8   have him using this gun; trying to use this gun; it's not

9   obliterated; it's not stolen.  He is not carrying it around on

10  him committing another crime or anything of that sort.  You

11  have a felon in possession of a firearm, and that is the

12  specific offense to address.  And I don't believe that just

13  because he has two priors that necessarily magically jumps him

14  to 71 months or wherever he is at.

15       *THE COURT:*  You think I should sentence someone

16  convicted of murder at a higher rate than someone convicted of

17  forgery, for felon of with a gun?

18       *MR. BELCHER:*  Do I think?  I don't know the specific

19  facts of those cases, Your Honor.

20       *THE COURT:*  Fair enough.  It was an unfair question,

21  but I couldn't resist.

22       *MR. BELCHER:*  Well, I think, to be honest with

23  Your Honor, that question, while I understand what you meant by

24  it, highlights the problems I am pointing out to this Court.

25  And the Court has seen it.  Mr. Sibert has seen it.  You have

1    got some people who have a whole array of prior felony

2    convictions, but somehow they don't trigger these.  And then

3    you have other people that have one or two, and they are

4    getting triggered.  Somebody with eight prior felony

5    convictions, but don't trigger that, are they justified in

6    getting a lower sentence?  I mean, that type of rational or

7    weighing against one another just doesn't seem to fit the

8    3553(a) analysis.

9          THE COURT:  Well, I will tell you this, there is an

10   aspect to the guidelines that I do think are, again to use the

11   fine legal term, a little goofy, and it's not one that's been

12   discussed yet.  So I'm just kind of putting it out there.  And

13   the thing that is a little troubling is that how the two

14   offenses are counted, and what I mean by that is this, back in

15   the day, and I can't tell you which year it was, it used to be

16   that you counted cases separately unless they were related

17   cases, and the concept was, *Well, if they are related, if they*

18   *are sort of the same thing, then let's count it as one thing,*

19   *rather than two things or three things.*  And when you were

20   sitting down and talking about, for example, felon with a gun,

21   these two prior felony convictions, or multiple prior felony

22   convictions were only counted if they scored separately.  Or

23   they scored, in some sense, so that if they were related cases

24   they wouldn't -- you wouldn't get hit for it, if you would; it

25   would count as one.

1          MR. BELCHER:  Right.  Three, instead of six.

2          THE COURT:  And, of course, what happened was that

3    there is some logic there that I can follow in the sense of

4    okay, well, we are going to treat him as -- we are going to

5    treat separate things as separate things, and therefore if you

6    have one separate thing, okay, and then if you have two

7    separate things, well, that's somehow more severe than one, and

8    again I'm not tying to adopt this structure to where it all

9    leads up to the Armed Career Criminal Act, because I take your

10   point, but at the very least, even there, there is discussion

11   of on a case separate from one another.  So there's this notion

12   that kind of prevailed of things being separate.

13          Sometime thereafter, and what I'm referring to is the

14   application note ten, that describes prior felony convictions,

15   for purposes of assessing whether or not the person gets the

16   aggravation under the guidelines, use only those felony

17   convictions that receive criminal-history points, and use only

18   those felony convictions that are counted separately.

19          Well, what happened is that the courts of the country,

20   both District Courts and Appellate Courts, were all over the

21   map in terms of what related cases were, and so, as I

22   understand matters, more as a matter of administrative

23   convenience, than anything else, the rule was changed.  And the

24   rule was changed to, if sentenced on the same day, count it as

25   one, or if it's charged in the same charging document, I

1    believe, and obviously if there's an intervening arrest that's

2    something different, but.  So you end up with this scenario

3    where, by factors that solely relate to making a Judge's job

4    easier, somebody may or may not get four additional points, and

5    it's more likely the case that that would occur, the closer in

6    time the events were.  Because the closer in time the events

7    are, it's more likely they could be sentenced on the same day

8    or charged in the same charging document, and that doesn't make

9    a whole lot of sense to me, in terms of deciding the

10   dangerousness, which is what we are really talking about, and

11   the specific of offense characteristics of a person, and

12   saying, *You are real dangerous, but what the heck, if you were*

13   *sentenced on the same day, you are not that dangerous, anymore.*

14         Now, I'm not suggesting for a moment that that is

15   Mr. Pompa's circumstance.  His two prior felony convictions

16   would be separate, under the current standard, and under the

17   earlier standard as well, but to the extent that I'm trying to

18   be guided by a need to avoid disparities, as one of the

19   factors, I'm not suggesting, again, that it is the factor or

20   putting my thumb on the scale, it does seem to me to be odd

21   that the closer in time matters are, the more the guidelines

22   permit, if not endorse, disparity, based on purely artificial

23   rules that have nothing to do with the dangerousness that

24   supposedly is driving the specific offense characteristics in

25   2K2.1, is it?

1           MR. BELCHER:  That's correct, Your Honor.

2           THE COURT:  So I mean that's there for me.  I look at

3     that, and as it pertains to Mr. Pompa, what I say is, again, he

4     doesn't technically fall under either the old or new, and so

5     I'm not suggesting that the guidelines should be lower, as a

6     matter of calculation, but that there is that curious factor,

7     and that his offenses are relatively close in time so that he

8     is in the zone where there would be the most disparity, and I

9     ought to think about that, and I am telling you I have.

10          So I don't know what -- to stay with the baseball

11    analogy, this is pretty much tee-ball, at this point, but if

12    you want to comment on that, feel free to.

13          MR. BELCHER:  Well, I mean, I think what the Court's

14    done is, in my opinion, highlighted not only what I have

15    concerns with the guidelines in general, and I understand the

16    Court and I am not -- really am not trying to have the Court

17    say, *This particular guideline should be thrown out the window*.

18    The Court, I know, has read my 3553 --

19          THE COURT:  Or more perhaps.

20          MR. BELCHER:  No, I think each of these enhancements

21    should be looked at, and that's what I have done.  I get, and

22    it's based on prior practices in Courts sentencing people, I

23    understand if someone has a sawed-off shotgun in a duffel bag,

24    what are you going to be using a sawed-off shotgun for?  I get

25    when they look at that, that's a specific fact of the case that

1    are before the Court.  I understand, I might not agree with two

2    versus four on stolen and obliterated, but I get why that is a

3    specific factor of the specific case in front of the Court that

4    warrants a different sentence than somebody that didn't.

5         Those -- all of those factors, in Subsection B, I get,

6    obviously, everyone here to witness, doesn't mean I might not

7    one day decide that it is ineffective in some other setting

8    with a particular client of mine, but what I have tried to do,

9    Your Honor, not only just pointing out what I believe the flaws

10   to be, but shining those flaws onto this case.  The Court has

11   hit it on the head, and Mr. Pompa will tell you, the first few

12   times I have met him, I told him his priors were going to be of

13   concern no matter if the Court agreed that ten levels should be

14   added for them or not.  That's just -- it's obvious.  I'm not

15   trying to ignore those or say we should get a sentencing

16   scenario where we ignore prior convictions.  I get that.

17        But turning to the facts of this case, these are two

18   prior convictions, six years or seven years -- I think six

19   years old.  They didn't involve firearms.  He doesn't have any

20   history of using firearms to commit violent felonies or violent

21   crimes.  The gun wasn't stolen.  The gun wasn't -- didn't have

22   obliterated serial numbers.  He wasn't using it in commission

23   of another felony offense.  He didn't have multiple firearms.

24   He didn't have an NFA firearm.  He didn't have a fully auto AK

25   or a sawed-off shotgun.  None of the specifics that aggravate a

 1   felon in possession.  At the end of the day, that's what we are

 2   talking about, he was a felon, he possessed a firearm, and then

 3   what's aggravating in addition to that?  That's the base crime.

 4   What's aggravating in addition to that for Mr. Pompa?

 5          THE COURT:  That his prior record is violent.  That's

 6   the answer.

 7          MR. BELCHER:  He has a prior record, Your Honor, and

 8   prior criminal history, especially when it's six or seven years

 9   old --

10          THE COURT:  Six or seven years old, because he has

11   been locked up since then.

12          MR. BELCHER:  I understand.  He has been out for over

13   a year, Your Honor.

14          THE COURT:  Okay.

15          MR. BELCHER:  And those are his only two convictions.

16          THE COURT:  They are certainly the only two score-able

17   convictions.  I am aware of that.  I grant you that.

18          MR. BELCHER:  Felony convictions.

19          THE COURT:  Well.  Felony convictions and score-able

20   convictions.

21          MR. BELCHER:  Right.  But he does not have a long,

22   extended, exacerbated history.  He has a problem with drinking,

23   and when he gets drunk, he does stupid things, that's no doubt,

24   that's obvious from the record, both times he was intoxicated

25   and both times he got in fights.  But --

1          THE COURT:  So --

2          MR. BELCHER:  -- how much --

3          THE COURT:  Hm?

4          MR. BELCHER:  Nevermind.  Go ahead.

5          MR. BELCHER:  Sober is --

6          THE COURT:  No.  What I was going to say is I'm not

7     sure that that's necessarily cutting the way you want it to

8     cut.

9          MR. BELCHER:  No.  I say he needs to get treatment for

10    it, and that's one thing we are going to be asking, but the

11    bottom line boils down to this, Your Honor, I understand the

12    criminal history is a factor in determining and overall 3553(a)

13    sentence, I don't believe, given the specific facts of this

14    case, that a calculation that has been made for everybody, that

15    ten levels should be added no matter what, without anything

16    else, is a one-size-fit all, cookie-cutter approach that should

17    apply.

18         We have a vanilla possession.  There's none of the

19    additional specific offense characteristics.  He has two

20    priors, he was on parole I understand that.

21         THE COURT:  Maybe more French vanilla than plain

22    vanilla.  He was on parole.

23         MR. BELCHER:  I said he was on parole.

24         THE COURT:  Okay.

25         MR. BELCHER:  That has been taken into account in his

1    criminal-history category, as well, Your Honor.  His priors

2    have been added on there.  His prior criminal history is for

3    recidivism.

4         THE COURT:  I don't mean to cut you off, I think I get

5    where you are coming from, and I think I need to give

6    Mr. Sibert -- excuse me, sir -- a -- an opportunity to speak to

7    this.

8         MR. SIBERT:  The guidelines, they create interesting

9    arguments all around.  I remember a Federal Public Defender

10   named Mr. Moore, he wrote an article in the sentencings, said

11   maybe we should just get rid of the guidelines, and I tend to

12   agree with that.

13        I think 3553 factors really do -- are supposed to do,

14   I think, what the guidelines were trying to do, and then I

15   think now that the guidelines aren't mandatory, it actually

16   affects what 3553 intends, that we're all over the map when it

17   comes to sentencings for defendants that have similar

18   backgrounds, similar criminal backgrounds and the types of

19   sentences they are getting for the offenses that they have

20   either pled guilty to or found guilty to.

21        Your Honor, there was one point that I do want to

22   address, and it goes down to what the Court said, and the Court

23   mentioned that it was considering this, and it goes to the

24   avoiding the disparity, and if you are looking at this

25   Defendant's past criminal behavior in 2006 and 2007, that was

1    in a close proximity of time, and I think what the Court was

2    trying to get there, is when you look at the 3553 factors, you

3    are looking at the overall characteristics of this Defendant as

4    a person, and the behavior of that person at a certain period

5    of time in his life.

6           I guess the only thing I can say to that is that that

7    wasn't the only time.  As this Court knows, we have a juvenile

8    conviction when he was 16, and then he, roughly, gets back in

9    trouble in 19, right again at 20 again, and as the Court

10   pointed out, he has been locked up pretty much since there --

11   then.  He was out for about a year, when gets caught with this

12   firearm in his car, that was loaded.

13          So I think the Court makes a good point when it comes

14   to a civic convenience of the Judges, maybe it should be about

15   the behavior, the patterns of that person at that period of

16   life.

17          Judge, I don't really want to do much further

18   argument.  I mean the Court has read my brief.  You know, and

19   as I said, we could go on forever about disagreeing or agreeing

20   or have arguments about the guidelines.

21          I do think the guidelines, in some aspects, if you

22   look at over the last 20 years, after this enhancement was in

23   place, it does pretty much keep -- I think it does pretty much

24   avoid unwarranted disparities, and the fact that most

25   defendants probably are sentenced into some type of similar

1    sentences for having two prior violent felonies or two drug

2    possessions.  I don't know why Congress doesn't say if you get

3    caught with a gun four or five times and you have been a prior

4    felon and this is your fourth or fifth time as a felon with a

5    gun, you don't an get enhancement, if you don't have one of

6    these two things.

7            I can tell the Court, I argued to my boss, John Walsh,

8    he had an opportunity to brief the Senate committee on the

9    whole firearm issue, this is one thing maybe you should look

10   at.  If someone keeps getting a gun when they are not supposed

11   to have a gun, maybe there should be something done with

12   Congress, in that aspect, instead of the size of the magazine

13   or the type of gun.

14           So I think I'm a bigger fan of the 3553 factors, and I

15   think it's an easier way to look at a defendant and provide a

16   fair and just punishment.

17           *THE COURT:*  So we have got a ten-year max?

18           *MR. SIBERT:*  So -- and that's kind of my point to this

19   brief.  I mean, here is a Defendant that does have a violent

20   past, and the Court pointed it out.  I don't need to rephrase

21   what his past is, but there is a violent behavior, which is a

22   concern.  I mean, and he hasn't been out there to prove that he

23   isn't violent.  So now he is on probation, he is under the

24   watchful eyes of the Court, and what does he have?  Not only

25   does he have a gun that's loaded with 15 rounds, he also has

1    morphine.  There's no reason why this Defendant needs morphine.

2    We can only -- I can only speculate.  I didn't charge it.  But

3    we can -- I think the Court can use its inference and take into

4    account why that morphine was in the car.

5            THE COURT:  I can, but I'm not going to.

6            MR. SIBERT:  And that's fair enough.  But I think

7    under 3553, that does raise a concern for the safety of the

8    community.  You know, the Defense brought up that he made dumb

9    decisions when he was intoxicated.  Young people make dumb

10   decisions.  When you are intoxicated, you really make dumb

11   decisions as a young person and when you are under the

12   influence you really make --

13           THE COURT:  Let me throw a couple of points at you and

14   then see where this goes.  I mean, ultimately, I suppose my

15   first comment is, *Yeah okay, I testified in a prior life in*

16   *front of the Sentencing Commission.  Don't read too much into*

17   *that, one way or the other.*

18           And all that I mean by that is that -- don't expect

19   me -- don't expect anything in particular of me to say the

20   guidelines are bad, the guidelines are good.  The guidelines

21   are what they are.  The law is the law.  And what I say, in

22   terms of what I think should be the law and what I think is the

23   law, as an advocate may be different than what I say as a

24   Judge, and I mean no criticism of that, I simply mean it as

25   informative, that, don't assume, based on what my prior

1    position was or what my prior statements to the Sentencing

2    Commission have been, that I am likely to do X or Y or Z in

3    this or any other case.

4            Again, no criticism, it's more an educational point.

5    You want 60 what?

6            MR. SIBERT:  Sixty-four months, Your Honor.

7            THE COURT:  So if we got a ten-year max, why is this

8    guy in the upper third, assuming that, you know, there should

9    be some general notion that the ones that need to be locked up

10   get more time than -- the ones that need to be locked up more

11   and longer get longer and more time than others.  Why is he,

12   basically, in the upper two-thirds, or on the cusp of the upper

13   third -- excuse me I said that horribly wrong.  Why is he on

14   the cusp of the upper third of time that's available to be

15   imposed by me in this case, in your opinion?

16           THE PEOPLE:  Well, 60 months is five years, 64 months

17   is five years, four months.  So upper third -- I would say

18   actually at the halfway mark at the statutory.  A little bit

19   over the halfway mark, and for the guideline purposes, I would

20   say 57 to 64, 64 to 71, we are right in the middle, splitting

21   the baby.  And the reason why is because he already has been in

22   prison for six years.  Six years, I'm not even asking for the

23   six years.  I'm asking under six years.  And it had no affect

24   on this Defendant.  It played no impact on him, whatsoever.  He

25   was still under the watchful eyes and he still committed

another felony offense.  It's his third offense.  He is still a

young man.  This is a chance for him, really, to -- it's kind

of like third-felony offense, third strike.  If you don't get

it now, you are never going to get it.  But you got to throw

hard now, to hopefully get in this Defendant's head; you can't

keep going down this path.

You are hurting your family, you are hurting yourself,

you are hurting society, and you know, I could have easily --

look, I put it in my motion, logically there's more reasons to

go above the guidelines in this case, if we want to go on a

logical up or below the guidelines.  And I respect the Court's

educational point.  I agree with the Court.  The law says we

got to look at the guidelines, and one thing I do think the

guidelines do well, in my opinion, if it's worth anything, is

the criminal-history category.  Because it does give -- if

someone is good for awhile or obeys the law, is a law-abiding

citizen, those past crimes go away.  But if someone is

continuing to violate the law, and isn't deterred to follow the

law, those things keep getting counted.  And I like the one

through six criminal-history category.  I think it shows,

really clearly, what kind of a person we have, presently.  Not

someone in the past, not someone in the future.  And you know,

based upon this Defendant's past, the deterrence, the factors

under 3553, this Court knows very well, that's why we recommend

64 months.

1          *THE COURT:*  Okay.  And you are correct.  My math

2     was -- I was mixing my months and my years.  It is just above

3     the -- you are obviously correct, and I just want to admit that

4     I was confusing or mixing my months and years when I'm saying

5     67 or whatever it is, is the upper third.  Obviously it is not.

6     It is exactly as you said, about five years, a little on the

7     upper side of five years.

8          Okay.  Is there anything else you want to say, with

9     regard to sentencing, while you are there, Mr. Sibert?

10          *MR. SIBERT:*  No, sir.  I think the Court understands

11    this Defendant very well, based upon what I have heard.  I have

12    rendered my opinions -- or my response, why we feel like

13    there's an issue here.  It's really the violent behavior.  And

14    I agree with the Court, you can't treat all defendants the

15    same.  And I agree with Mr. Belcher, I mean, not one shoe fits

16    all sizes -- or not -- all sizes.  But, you know, I remember

17    Judge Jackson asked me, *Well, Mr. Sibert, what's the worst*

18    *offense someone can do*?  I said *Murder*.  He said, *Right.  So*

19    *why did this guy get* -- the Defendant got two years, or

20    something.  *Judge, I don't know.  I wasn't part of that case.*

21    *I wasn't part of the facts*.  And that's what is important.

22    That's why the Judge is here, that's why the Court is here,

23    that's why we have advocates.

24          Every case is different, but you have to look at each

25    individual, and what I see in this individual, his past, based

1    upon the record that we have, and this is not the forum to

2    appeal that record, it's -- this is the forum to use that

3    record to understand the type of person, and it's the violence

4    that really is a concern for the Government.

5            THE COURT:  Mr. Belcher, obviously, in your prior

6    statements, you were dealing with the variance issue, but also

7    implicitly dealing with your statement, with regard to

8    sentencing, in terms of what I should do, but I don't want to

9    restrict you if there is something more that you wish to say,

10   with regard to sentencing.

11           I would invite that from you, and, Mr. Pompa if you

12   would join Mr. Belcher, because when he is done I'm going to

13   ask whether there is anything you wish to say and then I will

14   hear, briefly, from his wife.

15           MR. BELCHER:  Thank you, Your Honor.  Going through

16   all of this, I think the bottom line, it's simply clear, since

17   2006 the guidelines are just advisory.  They are just that.

18   They are one point to look at.

19           What I have done in my motion, while also pointing out

20   my disagreement with the guidelines, and have spent more than

21   half of my motion pointing out the 3553(a) factors and focusing

22   on what my client has done in his past.

23           As I predicted, we have spent most of this time

24   talking about two prior convictions.  Two prior convictions,

25   understand they are not good, and I understand that they should

1    be taken into account in an overall reasonable sentence.  Two

2    prior convictions occurring near each other, six years ago, is

3    not Mr. Pompa.  He certainly had two horrible run-ins, no

4    justifications for them, he was sentenced.  I think we get a

5    very slippery slope when the Government gets up here and says

6    we should look at prior sentences and the length that was

7    imposed, and we have to impose sentences further, higher or

8    nearer to those.  I think the question is --

9              THE COURT:  It's not just him.  It's also probation.

10             MR. BELCHER:  I understand that.  I understand that.

11   I'm just responding, I understand.

12             THE COURT:  Just like to throw the water in

13   Mr. Sibert's direction?

14             MR. BELCHER:  No.  I mean, we are the two advocates in

15   Court, representing two separate parties.  I'm just addressing

16   his deal, nothing personal to Mr. Sibert.

17             THE COURT:  No, I understand that.  I understand that.

18             MR. BELCHER:  Just simply put, I think that's a

19   slippery slope to go down, to say, this guy, he got six years

20   here, then you start going, what did he get six years for, is

21   it worse than what he did now.  It gets really slippery there.

22             What I think the focus should be, simply put, is yes,

23   two prior convictions, they didn't involve firearms, I

24   understand they were still violent, and that's something to be

25   concerned, but we are not dealing with a situation, if we are

1    dealing with zero to ten years, we are dealing with everyone

2    was a felon, and everyone possessed a firearm, and how to

3    differentiate all of these different people.  Mr. Pompa does

4    not have a record, does not have a history of running around

5    with guns and using those guns to cause and wreak havoc in

6    society.  He committed one crime, threatening to kick someone

7    with a foot, felony menacing; deadly weapon was a foot.  Is

8    that -- is that anyway justifying it or lessening that crime?

9    No.

10          He doesn't have a history, though, of running around

11    with guns.  The specific facts of this case is he does not have

12    any specifics of the actual offense itself, that makes it so

13    much more aggravated than some other prior felon that was in

14    possession of the gun.  Specifically, looking at his personal

15    history and characteristics, the nature and circumstances of

16    this offense, and the need to afford a just punishment and what

17    everyone is really talking about, here today, is adequate

18    deterrence.  Three years in prison, followed by three years of

19    supervision, totaling six years of Federal intervention, along

20    with a substance-abuse program, is sufficient, but not greater

21    than necessary, when looking at the actual specifics of

22    Mr. Pompa to achieve those goals, and we would ask the Court to

23    consider that.

24          Additionally, I know the Court mentioned at the Change

25    of Plea, it's not inclined to do so, but my client,

1    nevertheless, would ask the Court to recommend a placement in

2    the Bureau of Prisons.  After the Court's statement, I did some

3    research and looked into the policy and designations of BOP,

4    while it's not mandatory to follow it, they actually put that

5    down on the designation worksheet as one of the factors to

6    consider in where to place Mr. Pompa.  So we would ask the

7    Court to consider that.

8           Additionally, we would ask the Court to make a

9    recommendation that Mr. Pompa be allowed to participate in the

10    residential drug substance abuse and alcohol program in the

11    Bureau of Prisons.  That recommendation is really important in

12    this case, because Mr. Pompa cannot receive the year off, so he

13    will already be put on the end of the list to make room for

14    individuals that could potentially get credit off of their

15    sentence for successful completion.  I think the record's

16    explicitly clear that Mr. Pompa has a drinking problem, and

17    that needs to be addressed.  I think that's a -- I think

18    successful -- addressing that successfully will greatly

19    diminish his risk of recidivism in the future, and if the

20    Court, whenever it's an appropriate time, would allow his wife

21    to make a brief statement.

22           *THE COURT:*  I was going to say that I was -- I did say

23    that Mr. Pompa would speak after you, but I want to give him

24    the last word.  So if his wife would come forward and he would

25    return to his seat.

1          *THE WITNESS:*  Good afternoon.  My name is Kristin

2    Lopez.  I'm Kevin Pompa's wife.  I've known Kevin Pompa since

3    November 2012.  During that time I have known Kevin to be a

4    kind, giving and loving person, especially to his daughter.  He

5    has a strong, family orientated background and has always tried

6    to do the right thing, how he ever got into this situation is

7    incomprehensible to me.  As this is not the person --

8          *THE REPORTER:*  I'm sorry.  You need to slow down.

9          *THE WITNESS:*  I'm sorry.  I got nervous.  The Court

10   will only view him based on his actions here.  I ask the Court

11   to consider his life too.  Since I've known Kevin, he had a

12   steady job with a company called Diversified Builders, always

13   responsible to get to work and on a daily basis.

14         Kevin has always been helping his mother around the

15   house, not only financially, but with handiwork.

16         Myself, Your Honor, Kevin has helped me out

17   financially and also with transportation, but mainly I would

18   like to stress to you, to consider most importantly, his

19   daughter, whom is 5 years old.  He missed out on four years of

20   her life, based on the relationship I had witnessed, she needs

21   her father.  He was helping out with child support and having

22   his daughter every weekend, taking her to movies and other

23   activities, but mainly spending quality father-daughter time

24   together.  This is much needed for his little girl who wants to

25   be and is a big part of his life.

1          It is true that a crime has been committed so the

2     guilty party, and the guilty party must own up to the

3     consequences.  I do not dispute this, but I ask on behalf of

4     myself and his family to consider my husband, Kevin Pompa, not

5     only for the action before the Court, but also for his actions

6     in his life that warrant merit, as well.

7          Thank you for your consideration.

8          THE COURT:  Thank you, ma'am.  All right.  Mr. Pompa,

9     I will hear from you.

10         THE DEFENDANT:  Your Honor, I want to say I don't have

11    any excuse as to what I did or anything like that or, but I

12    just want to make it clear, that I didn't intend to commit any

13    crime with the gun.  I wasn't -- I wasn't trying to go and rob

14    anybody or anything like that.  I just simply -- there's no

15    excuse to it.  I was dumb.  Had the gun with me when I wasn't

16    supposed to and I know that, and I am ready to own up to the

17    consequences, and I know I'm going to have to do prison time

18    for that.

19         I just want to try to better myself and get help for

20    my alcoholism and all of that, and also, I want to apologize to

21    the Court, but mainly to my family for all of the trouble that

22    I have caused them.

23         THE COURT:  All right, sir.  Anything else?

24         THE DEFENDANT:  That's it.

25         THE COURT:  Okay.  In fashioning a sentence here

1    today, I have considered the Presentence Report, all matters

2    related to that report filed by the Defendant and the

3    Government, statements and arguments of counsel for the parties

4    here today, the statement of Mr. Pompa, the statement of his

5    wife.

6           I'm mindful of the fact that I'm required by law to

7    impose a sentence sufficient, but not greater than necessary,

8    to achieve the purposes of sentencing as described in 18 U.S.C.

9    3553(a)(2).  In fashioning such a sentence, I have considered,

10   both individually and collectively, all of the 3553(a) factors

11   which must be considered in determining a sentence,

12   specifically including those factors as have been discussed and

13   emphasized by counsel on both sides here today.

14          Mr. Pompa, I want you to understand what I'm going to

15   do.  Sometimes, as I and others speak about these things, we

16   use terms that we're familiar with that just aren't familiar to

17   the ordinary individual; 3553 and things of this nature.  So I

18   want to talk to you, and I am going to tell you what I'm going

19   to do, then after I tell what I'm going to do and why I'm

20   going to do it, I will give counsel for Mr. -- for the

21   Government and counsel for you an opportunity to make whatever

22   additional record they want -- wish to make, and then after

23   that, assuming they don't highlight for me some illegality or

24   impropriety in the sentence, I will then proceed to impose the

25   sentence in the formal language that's used in sentencing in

1    U.S. District Court.  Understood?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  I'm going to vary downward from the

4    guideline range, but I'm not going to 37 months.  I'm going to

5    give you 48 months.  The reasons are multiple.  First, I think,

6    ultimately, you know, I'm aware of what the guideline is, but I

7    think this is the appropriate sentence.  I do think that you do

8    have a prior history.  I do think there's violence in it, but I

9    also recognize that you, essentially, served only one prison

10   term in your life, and that the only time you have been to

11   prison has been for both of these, and that's a little

12   different than an individual who has two prior instances and

13   has been in prison more than one time.

14          Again, I'm not suggesting that the number of times

15   that one is in prison is definitive, but I think that it's

16   worth noting.  I think that these were close in time.  I think

17   that you are young.  I note that you do have an alcohol

18   problem, and I note that none of your prior offenses, the ones

19   of concern to me, involve a firearm.  The two felonies that you

20   have in your adult life.

21          Having said that, counterbalancing that a little bit,

22   is there is the juvenile conviction where there's a dangerous

23   weapon that's involved, and I am not unmindful of that either.

24   As I indicated, it does not appear that there's any indication

25   to me, notwithstanding the invitation to draw an inference from

1   the presence of some small amount of morphine, any indication

2   that this gun was being used in any other way or was

3   contemplated as such.  I'm not going to say that it's benign,

4   because, you are, in fact, on probation -- excuse me -- parole

5   at the time that you possessed this, but I also am aware of the

6   fact when you came out of prison, you worked steadily, and

7   that's not easy to do, and a lot of people in your circumstance

8   fail at holding a job and want to go to other ways of making

9   money, and you didn't do that, and I am not going to minimize

10   that at all.

11          So in view of the fact that there is a degree of

12   recency or relative recency between the two offenses, the fact

13   that you really have incurred one adult sentence, at least of

14   incarceration, the fact that you are relatively young, do need

15   alcohol treatment, that there is no gun use in the prior

16   violent felonies that are driving the guideline in this case,

17   and that the only score-able offenses that you have, to make

18   Mr. Sibert's point, is if you count the guidelines, well, those

19   things, if you are okay for awhile, things fall off the charts.

20   Well the only score-able offenses that you have, I believe are

21   these two offenses, and there really is nothing else there.  I

22   think, taking all of that into account, as well as the oddness

23   of the guideline that I was discussing with Mr. Belcher, at

24   least as it pertains to felony offenses committed in relative

25   proximity to each other, and a circumstance where there's

1    probably more disparity there than anywhere else, leads me to

2    say that it is an appropriate sentence of four years.

3            I note, but don't base it on guideline analysis, that

4    what I'm actually doing is saying I'm going to give you some

5    consideration, and if I do that, I'm not going to treat your

6    two felonies as one and bring it down from a 22 -- excuse me --

7    bring you down from a 24 to a 20.  In fact, it's more like I'm

8    splitting that baby, if you would, and saying, *Well, you really*

9    *didn't have just one,* it's somewhere between those two, and if

10   I looked at it as a 22 minus three that would be 19, criminal

11   History Category IV, 46 to 57, coincidentally, the sentence

12   that I think is the appropriate sentence, falls in that range,

13   as well.

14           So whether I approach it from a pure 3553 analysis or

15   approach it, kind of, trying to look at guidelines and see what

16   makes sense in terms of how to categorize you, I come up with a

17   range that I think matches and coincidentally permits the exact

18   same sentence.

19           Now, the unexpected part of this is that, obviously

20   I'm going to give you three-years supervised release.  I'm

21   going to give you $100 assessment, because I have to do that.

22   I will make the recommendations for the conditions that the

23   probation department has requested, and I will also make the

24   recommendations that your lawyer has requested.  I will also

25   order this, because you were on parole at the time, I'm going

1   to order that your sentences be consecutive to any sentences

2   anticipated for the parole violation that the State may impose

3   under the authority of *United States vs. Setser*. I recognize,

4   quite well, that may be something that's utterly frustrating,

5   because I believe you are in Federal custody now, and if the

6   State decides to disagree with me in that regard, well, then

7   the State decides to disagree with me in that regard, and I

8   don't mean that I would alter your sentence if my desire here

9   ends up being frustrated, but to the extent anyone wants to

10  communicate with the Court how I viewed things, I do have the

11  authority to order that it be consecutive to a sentence that's

12  not yet been imposed, as I understand it, under the authority

13  of the *United States vs Setser*, and I will order that

14  recognizing full well that I may not be able to give full

15  affect to that, given the nature, the sequencing and timing of

16  his appearances in court and whose custody he is in right now.

17          So with all of that, do you understand what I'm going

18  to do, Mr. Pompa?

19          *THE DEFENDANT:*  Yes, Your Honor.

20          *THE COURT:*  Mr. Sibert, any further record?

21          *MR. SIBERT:*  Your Honor, I just misspoke earlier.  I

22  said 15 rounds.  It was actually six rounds in this case.

23          *THE COURT:*  Understood.  Mr. Belcher?

24          *MR. BELCHER:*  Nothing further, Your Honor.  Thank you.

25          *THE COURT:*  All right.  Then as I said earlier,

1    neither the Government nor the Defendant has challenged the

2    factual aspects of the Presentence Report or the accuracy of

3    the computations.  There have been objections as to whether I

4    should adhere to those, but I adopt the factual statements and

5    guideline applications, without objection, as my findings of

6    fact concerning sentencing.  I find that under the guidelines,

7    the Offense Level is 21, Defendant's Criminal History Category

8    is IV, the total offense level, after acceptance of

9    responsibility credit, which results in an imprisonment range

10   of 57 to 71 months and a fine range of 7500 to 75,000,

11   supervised-release range of one to three years, nonetheless, I

12   depart for the reasons I just stated in my colloquy with

13   Mr. Pompa, and pursuant to the Sentencing Reform Act of 1984,

14   it is the judgment of the Court that the Defendant,

15   Kevin Pompa, is hereby committed to the Bureau of Prison --

16   custody of the Bureau of Prisons for a term of 48 months.  Upon

17   release from imprisonment, he shall be placed on supervised

18   release for a term of three years.  Within 72 hours of release

19   from custody of the Bureau of Prisons, the Defendant shall

20   report, in person, to the probation office in the district to

21   which he is released.  While on supervised release he shall not

22   commit another Federal, State or local crime; shall not possess

23   a firearm, as defined in 18 U.S.C. Section 921, and shall

24   comply with the standard conditions that have been adopted by

25   this Court.

1          The Defendant should not unlawfully possess a

2    controlled substance.  He shall refrain from any unlawful use

3    of a controlled substance.  He shall submit to one drug test

4    within 15 days of supervision and two periodic tests,

5    thereafter.  He shall cooperate in the collection of DNA as

6    directed by the probation officer.  I find that the following

7    special conditions of supervised release are determined to be

8    reasonably related to the factors enumerated in 18 U.S.C.

9    3553(a) and Section 3583(d).

10          Further, based on the nature and circumstances of the

11   offense, and the history and characteristics of this particular

12   Defendant, the following conditions do not constitute greater

13   depravation of liberty than reasonably necessary to accomplish

14   the goals of sentencing; one, the Defendant shall participate

15   in and successfully complete a program of testing and/or

16   treatment for substance abuse as approved by the probation

17   officer until such time as he is released from the program by

18   the probation officer.  He shall abstain from the use of

19   alcohol or other intoxicants during the course of supervision.

20   He shall pay the costs of treatment as directed by the

21   probation officer.

22          Two, the Defendant shall submit his or -- his person,

23   property, house, residence, papers or office to a search

24   conducted by the United States Probation Officer.  Failure to

25   submit to a search may be grounds for revocation of release.

1    Mr. Pompa shall warn any other occupants that the premises may

2    be subject to searches pursuant to this condition.  An officer

3    may conduct a search pursuant to this condition, only when

4    reasonable suspicion exists that Mr. Pompa has violated the

5    condition of his supervision, and that the areas to be searched

6    contain evidence of this violation.  Any search must be

7    conducted at a reasonable time and in a reasonable manner.

8         I also, as I indicated to Mr. Pompa, it is my

9    statement and direction to the Bureau of Prisons, that this

10   sentence be imposed in a manner which is consecutive to that,

11   which might be -- any sentence that may be imposed in

12   connection with his pending parole violations in State court

13   that are arising out of Adams County District Court, case

14   number 06CR1453, and 07 -- Denver District Court 07CR4548.

15        I also recommend that the Bureau of Prisons designate

16   a facility for Mr. Pompa within the District of Colorado.

17   Finally, recognizing that Mr. Pompa has an alcohol problem, I

18   will recommend that he be admitted to the RDAP program, and I

19   will leave it at that.

20        It's not ... all right.  Mr. Pompa shall pay a special

21   assessment of hundred dollars, due immediately.  I find that he

22   does not have the ability to pay a fine, so I will waive the

23   imposition of a fine in this case.  And Mr. Pompa is remanded

24   to the custody of the United States Marshal.

25        Is there anything further on behalf of the Government?

1          MR. SIBERT:  No, Your Honor.  Thank you.

2          THE COURT:  On behalf of Mr. Pompa?

3          MR. BELCHER:  No, Your Honor.  Thank you.

4          THE COURT:  We are in recess.

5          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

6      (Recess at 5:17 p.m.)

7                      REPORTER'S CERTIFICATE

8

9          I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

10

11      Dated at Denver, Colorado, this 28th day of June, 2016.

12                          s/Tammy Hoffschildt

13                      _____

14                      Tammy Hoffschildt, FCRR RMR,CRR

15

16

17

18

19

20

21

22

23

24

25